# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NORTH DAKOTA
### EASTERN DIVISION

| | | |
|---|---|---|
| Dr. Katayoon Baradaran Ebrahimi, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **COMPLAINT AND DEMAND** |
| | ) | **FOR JURY TRIAL** |
| Sanford Clinic North, a/k/a Sanford | ) | |
| Health, North Dakota Professional | ) | |
| Health Program, and Windrose | ) | |
| Recovery Chicago LLC, d/b/a | ) | |
| Positive Sobriety Institute of Chicago, | ) | |
| | ) | |
| Defendants. | ) | |

Plaintiff, for her Complaint, alleges and states as follows:

## NATURE OF THE ACTION

1.    This is an action under Title VII of the Civil Rights Act of 1964, Title I of the Civil Rights Act of 1991, the Americans with Disabilities Act, and state law causes of action under the North Dakota Human Rights Act and other common law causes of action to correct unlawful employment practices based upon national origin discrimination, employment discrimination based on retaliation for report of unlawful conduct and discrimination based on claim of perceived disability, to provide appropriate relief to Dr. Katayoon Baradaran Ebrahimi ("Dr. Ebrahimi").

## PARTIES

2.  At all times relevant to this action Dr. Ebrahimi has been an employee under Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), the North Dakota Human

Rights Act ("NDHRA"), and the Americans with Disabilities Act ("ADA"). Dr. Ebrahimi is a naturalized citizen of the United States with residence and domicile in the State of New Hampshire.

3.    Sanford Clinic North, a/k/a Sanford Health ("Sanford"), is a health care provider doing business in Fargo, North Dakota, and is an employer under Title VII, the NDHRA and the ADA. Sanford is incorporated and has its principal place of business in the State of North Dakota.

4.    North Dakota Professional Health Program (hereinafter "NDPHP") is a non-profit located at 919 S. 7th St., Suite 305, Bismarck, North Dakota. NDPHP is incorporated and has its principal place of business in the State of North Dakota.

5.    Windrose Recovery Chicago LLC, d/b/a Positive Sobriety Institute of Chicago ("PSI"), is an LLC registered to do business in the State of Illinois. PSI's sole member is a citizen of the State of Illinois.

**JURISDICTION AND VENUE**

6.    This court has jurisdiction over Sanford pursuant to 28 U.S.C § 1331 federal question jurisdiction, as the claims against Sanford arise from violation of the laws of the United States. Sanford's actions constitute discrimination and retaliation against plaintiff in violation of Title VII, 42 U.S.C. §2000e-3(a), discrimination against Plaintiff based on her national origin in violation of 42 U.S.C. §2000e-2(a) and discrimination for a claim of perceived disability against Plaintiff in violation of the ADA, 42 U.S.C. §12112.

2

7.     This court has diversity jurisdiction pursuant to 28 U.S.C § 1332(a)(2), as plaintiff is a naturalized citizen of the United States and is domiciled in New Hampshire, Defendants Sanford Health and NDPHP are headquartered and have their principal places of business in North Dakota, and Defendant PSI's sole member is a citizen of the state of Illinois. The amount in controversy is more than $75,000, exclusive of interest and costs.

8.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) as the employment practices and conduct alleged to be unlawful and a part of the events or omissions giving rise to the claims were committed within the jurisdiction of the United States District Court for the District of North Dakota.

9.     Plaintiff timely filed Charges of discrimination and retaliation against Sanford Health, NDPHP and Positive Sobriety Institute of Chicago with the Department of Justice, Equal Employment Opportunity Commission (EEOC) and the North Dakota Department of Labor and Human Rights. Dr. Ebrahimi received the required Notice of Right to Sue from the EEOC and she has complied with all administrative requirements.

## FACTUAL BACKGROUND

### I. Dr. Ebrahimi's Background and Employment with Sanford

10.     Dr. Ebrahimi is an Iranian immigrant woman. She completed her medical school and residency in ophthalmology at Iran University of Medical Sciences. After her residency she was awarded multiple fellowships in world-renowned programs including University College London, Johns Hopkins University, University of California San Francisco, and Duke University. Dr. Ebrahimi worked as a faculty member at Johns Hopkins University, University of Missouri, and University of Pennsylvania. Dr.

3

Ebrahimi has an exemplary work record. With this extensive and impressive medical background, she was set to make a significant contribution for the community in Fargo, ND.  In January 2022, Dr. Ebrahimi joined Sanford Clinic North as a Single Retina Specialist pursuant to her Staff Physician Agreement with Sanford Clinic North.

11.     The Staff Physician Agreement was a contract between Sanford Clinic North, a nonprofit organization ("Sanford"), and Katayoon Baradaran Ebrahimi, the plaintiff. The contract was signed by Dr. Ebrahimi on October 19, 2021, and on October 22, 2021, by a vice president of Sanford Clinic North.

12.     Plaintiff's employment commenced on January 10, 2022, and was to continue for a period of two years unless terminated as provided in the agreement. It included automatic renewals for one-year terms unless terminated in writing as provided in the agreement.

13.     Dr. Ebrahimi was employed as a full-time employee physician. Her compensation for her first year was "not less than $500,000," and then to a rate not less than 95 percent of $500,000, with incentive compensation available.

14.     Dr. Ebrahimi received a $30,000 signing bonus in the form of a loan that would be repaid and forgiven over 24 months as she continued to be employed by Sanford.

## II. Dr. Ebrahimi Reported Suspected Unlawful Conduct

15.     From the time Dr. Ebrahimi began her employment with Sanford she was treated less favorably with respect to the terms and conditions of her employment in comparison to coworkers that were not members of her protected class. She was

4

subjected to significantly differential standards including her support staffing levels and expectations.

16.     The mistreatment came to a head on October 10, 2022.

17.     While Dr. Ebrahimi was performing her work duties, she noticed a new referral patient from Veteran Affairs (VA) on her schedule without any accompanying referral note, as was standard. When Dr. Ebrahimi asked her staff about the notes, she was not given any information, nor did any of her staff follow her instructions to obtain this information from the referring party VA. Dr. Ebrahimi asked her staff to contact the VA for referring notes, but the staff simply stated they could not get through on the phone. When Dr. Ebrahimi asked for the phone number to speak to the VA herself, her staff responded that she could not speak to anyone and refused to pass the phone to her.

18.     Sanford's staff openly refused Dr. Ebrahimi's direction, failed to follow up on her questions or follow her instructions and mocked her. Dr. Ebrahimi was concerned at that point that she would not be able to provide safe treatment without the patient's relevant medical history, and with her concerns being compounded by staff members' actions and attitude, she emailed the Chief Medical Officer for Sanford, Dr. Douglas Griffin, to report her concerns. Specifically, Dr. Ebrahimi emailed Dr. Griffin, "I would like to discuss a patient safety issue as soon as possible.".

19.     Within minutes of Dr. Ebrahimi emailing Dr. Griffin, he called her and scheduled a meeting between the two for noon the same day, October 10. However, when she agreed to meet with him at noon, he changed the meeting and rescheduled it for later the same day, October 10th, at 5:00 pm.

5

### III. Sanford Discriminated and Retaliated Against Dr. Ebrahimi After Her Report of Suspected Unlawful Conduct

20.     During her meeting with Dr. Griffin, Dr. Ebrahimi's report of hostility and resistance from her staff – which were affecting patient safety and potentially stemmed from Dr. Ebrahimi's national origin – were not addressed, but were met with accusations and hostility from Dr. Griffin. Instead of discussing Dr. Ebrahimi's report of misconduct and unlawful activity by Sanford employees, and addressing her safety concerns, which is what Dr. Ebrahimi believed the meeting, that was scheduled at her request, would be about, Dr. Griffin took no corrective action but stated that Sanford had concerns of its own about her and her patients' safety and cancelled her clinics. This was a shock to Dr. Ebrahimi.

21.     Dr. Griffin told Dr. Ebrahimi that he was cancelling her clinics and was taking her off her job duties effective immediately. Dr. Ebrahimi was confused about this, as Dr. Griffin had provided no reason for this decision. She asked what concerns Sanford had about her or her work. But Dr. Griffin refused to elaborate, instead strongarming and coercing her to sign a three-page release on the spot, consenting to undergo an "investigation," refrain from her privileges, be placed on a paid administrative leave, and release communications regarding investigation to Sanford.

22.     Disturbingly, Dr. Griffin would not provide Dr. Ebrahimi with any basis for these actions nor allow her to think about her options. Dr. Ebrahimi felt coerced and that she had no option but to sign the form and agree to Sanford's plans in order to keep her job. Even though she had no idea what the basis for the decision was.

6

**IV. Sanford along with NDPHP Coerced Dr. Ebrahimi to Undergo an Impermissible and Unwarranted Evaluation**

23.    The following day, October 11, 2022, Dr. Ebrahimi received a phone call from Ann Leiseth, Executive Director of the NDPHP. Ms. Leiseth told Dr. Ebrahimi that she would need to travel to Chicago or Florida for an evaluation. Dr. Ebrahimi was confused by "an evaluation in Chicago or Florida" and asked Ms. Leiseth what she was being evaluated for, but Ms. Leiseth did not know. Ms. Leiseth later emailed Dr. Ebrahimi telling her that she was being evaluated because of Sanford's report regarding Dr. Ebrahimi's mental health. On October 13, 2022, Ms. Leiseth emailed Dr. Ebrahimi stating: "It would be in your best interest to follow through. If not NDPHP will be required to make a report to the board of medicine."

24.    On October 13, 2022, Dr. Griffin also emailed Plaintiff that he referred her to NDPHP to go through an evaluation regarding "mental health concerns." In the same email, Dr. Griffin continued compelling Dr. Ebrahimi to undergo the evaluation stating: "If you do not comply with completing the evaluation, the terms of your administrative leave will need to be revisited."

25.    Dr. Ebrahimi was coerced by Sanford and Dr. Griffin and NDPHP to go through this evaluation without providing any further detail of the nature of this referral. Dr. Griffin and NDPHP both threatened Dr. Ebrahimi with sanctions and reports to the Board of Medicine. Dr. Ebrahimi felt that her professional livelihood was at stake when she was told that she had to go through the evaluation. Otherwise, she was told by both

7

Dr. Giffin and NDPHP they would report her to the North Dakota Medical Board of Licensure.

26.     Dr. Ebrahimi had no disciplinary action against her or warnings of any problems in advance of these actions taken by Sanford. In fact, the employer evaluation done for Dr. Ebrahimi's work in June 2023 was comprised of overwhelmingly excellent comments and feedback from her peers and the Director.

27.     Dr. Ebrahimi was concerned with Sanford's response to her report of patient safety problems because she did not and does not suffer from mental health problems, nor was she presenting any legitimate symptoms that would support a conclusion of mental health problems.

28.     Because Dr. Ebrahimi had no doubt about her own mental, emotional, or physical ability to perform her job at high standards, she engaged with Sanford's process in order to clear her name of these accusations.

### V. Chicago PSI, NDPHP and Sanford Conspired to Try to Force Dr. Ebrahimi into Treatment and Monitoring

29.     At the direction of Sanford and NDPHP, Dr. Ebrahimi travelled to the Positive Sobriety Institute of Chicago ("PSI")[1] to be evaluated on October 19 and 20, 2022. There, Dr. Ebrahimi was subjected to several embarrassing, humiliating, degrading, and traumatizing experiences, while still not being provided with any information as to why she was being evaluated.

---

[1] The report conducted by PSI was drafted under the moniker Multidisciplinary Comprehensive Assessment Program ("MCAP") of Chicago.

30.     Dr. Ebrahimi was never told what the reasons were for her being evaluated in the first place. NDPHP never told her. Sanford never told her. And while she was there, PSI never told her. Dr. Ebrahimi felt coerced to consent to the entire evaluation in order to clear her name and in an effort to keep her license and career safe. PSI went through with the evaluation, and subjected Dr. Ebrahimi to humiliating and degrading experiences, without informing her of the cause of or reasons for subjecting her to these experiences.

31.     The clinic required Dr. Ebrahimi to give breath, blood, and urine samples, again, without providing any explanation of what those samples were being taken for or what the basis of their investigation was, despite her repeated demands for this information.

32.     During PSI's evaluation, Dr. Ebrahimi was made to stand against a wall and have a lock of her hair cut from her head. Prior to having her hair cut, Dr. Ebrahimi was provided with no notice or explanation of what was to come.

33.     Dr. Ebrahimi suffered through the entire evaluation, being compliant with all their demands, answering every question and allegation truthfully and fully, despite their total lack of foundation or justification.

34.     Upon information and belief, NDPHP does not send individuals and PSI does not expose anyone outside of Dr. Ebrahimi's protected class to psychological evaluations without providing any information regarding the nature of referral and exams. The discriminatory and retaliatory conduct of Sanford along with discriminatory conduct of NDPH and PSI resulted in these degrading experiences.

9

35.     Once Dr. Ebrahimi was back in Fargo, on November 1, 2022, PSI contacted her and asked her for references that could speak to her character, professional manner, and emotional and mental wellbeing. Dr. Ebrahimi provided the names and contact information of her professional peers with whom she had extended relationships. She also provided a copy of letters of references that her mentors wrote for her in the past. All these references were ignored by PSI. There was no mention of these references in PSI's final report. Dr. Ebrahimi did not provide the names of Sanford employees because she had worked with those individuals for less than one year. Dr. Ebrahimi did not think they possessed a strong basis to provide a historical context, which is to say nothing of the bias and retaliation that she faced at their hands.

36.     The next day, PSI reached out to Dr. Ebrahimi asking specifically for Sanford-based references. Dr. Ebrahimi provided Sanford-based references. Soon thereafter, PSI contacted Dr. Ebrahimi again and coerced Dr. Ebrahimi to accept Dr. Griffin's suggested individuals from Sanford as references otherwise PSI would report Dr. Ebrahimi to NDPHP and Medical Board of Licensure.

37.     PSI also required Dr. Ebrahimi to complete yet another psychological questionnaire and complete an additional zoom meeting with a psychiatrist, psychologist, and psychiatric nurse on November 7, 2022.

38.     On November 9, 2022, Dr. Ebrahimi received for the first time the timeline report Dr. Griffin had made to PSI. She received, for the first time, the complaints Sanford Health allegedly had about her from PSI (and not Sanford Health), only the day before the PSI report was released, following her unnecessary and forced "evaluation."

39.    None of the reported incidents provide a basis for placing an individual on leave, requiring them to undergo an evaluation, and subjecting them to humiliating and degrading practices.

40.    Dr. Griffin had put together this defamatory document full of false and misleading information and submitted it to attack Dr. Ebrahimi's credibility and ability to perform her job. Although the vast majority of Dr. Griffin's submission is flatly untrue, more significantly, not a single reported incident provides any justification to accuse Dr. Ebrahimi of having mental health issues, let alone a basis to find her unfit to practice medicine.

41.    His report also relies almost entirely on second-hand information from the exact staff Dr. Ebrahimi had reported to Dr. Griffin were disrespectful, insubordinate, and hostile towards her based on her national origin.

42.    Dr. Griffin's animus towards Dr. Ebrahimi is obvious, given that he begins criticizing her practice no more than a few days after she started in January 2022. A few cited incidents in the first months of her recruitment were related to learning about clinic and on-call workflow in their department. The other a few cited encounters clearly demonstrated Sanford's lack of interest or ability to facilitate effective coordination in patient management and provide a safe environment. None of the incidents, by themselves, indicate a "mental health problem" or "schizophrenia" or "disruptive behavior".  It does not even justify a mental health referral or evaluation.

43.    At no point did Sanford ever discuss with Dr. Ebrahimi any concerns about any "disruptive behavior" or "mental health" issues. These alleged concerns with

performance and behavior not addressed or memorialized in appropriate disciplinary documents. Dr. Ebrahimi was never counseled or disciplined, on these "consistent issues." Her evaluation from June 2023 was overwhelmingly positive.

44.     What the facts reveal is that only following Dr. Ebrahimi's report of unlawful activity and misconduct at Sanford and patient safety concern on October 10, 2022, was she then discriminated against and retaliated against, and accused to manufactured concerns about her "performance and other behavioral issues" and subjected to her intolerable experience with PSI.

45.     Upon information and belief, Sanford does not send individuals outside of Dr. Ebrahimi's protected class to psychological evaluations in lieu of conducting investigations, coaching, warnings, etc.

46.     Upon information and belief, Dr. Griffin put the report together only after Dr. Ebrahimi had reported the suspected unlawful conduct and staff's hostility and noncompliance to him. The report relies almost entirely on second-hand information from the very staff who were disrespectful, insubordinate, and hostile to Dr. Ebrahimi and that she had reported to Dr. Griffin. The content of the report and the unsubstantiated accusations make clear Dr. Griffin's animus towards Dr. Ebrahimi.

47.     On November 9, 2022, Dr. Ebrahimi received a phone call from Dr. Melissa Henke, NDPHP Medical Director. During this conversation, Dr. Henke stated she does not remember why she referred Dr. Ebrahimi for an evaluation by PSI to begin with but at the same time remembering and inquiring about the result of PSI evaluation.

12

48.    NDPHP and Dr. Henke refused to provide Sanford's referral note to Dr. Ebrahimi despite repeated requests made by her and through her counsel. Dr. Henke never addressed Dr. Ebrahimi's questions and concerns.

49.    Dr. Ebrahimi's fears about Dr. Griffin's motivations for making the report and referral were confirmed when she received a copy of PSI's report about her on November 10, which indicated Sanford had referred her to be evaluated for "Schizophrenia".

50.    Only then did Dr. Ebrahimi realize the full extent of the retaliation. Schizophrenia is a serious mental disorder in which people interpret reality abnormally. It involves a range of problems with thinking, behavior, and emotions. It is a chronic condition. It is rare for individuals older than the age of 45 to be diagnosed with this disorder. Dr. Ebrahimi was 52 at the time.

51.    The PSI report, itself, demonstrates fundamentally flawed process. While PSI documented that Dr. Ebrahimi felt Dr. Griffin initiated the evaluation in retaliation for her reporting safety concerns, it not only ignored Dr. Ebrahimi's concern but continued to rely heavily on biased information from the instigators of the evaluation.

52.    None of PSI's boundary, substance and behavior, medical assessments nor its drug screen found any circumstances that would provide any basis for legitimate concern about Dr. Ebrahimi's mental health or ability to practice medicine. Dr. Ebrahimi scored at or above average on every single indicator in PSI's exam and had no findings of any circumstances that would provide any basis for concern about her mental health or ability to practice medicine.

13

53.     Incredibly, despite presenting no signs of mental illness to PSI's clinicians (or having a history of mental illness), the PSI report concluded that Dr. Ebrahimi was "not safe to practice medicine with reasonable skill and safety at this time." And yet somehow, the PSI report refers Dr. Ebrahimi back to NDPHP "to determine accurate diagnoses and ongoing treatment."

54.     While PSI documented that Dr. Ebrahimi felt Dr. Griffin initiated the evaluation in retaliation for her reporting safety concerns, PSI ignored her concern and made a biased and discriminatory conclusion. PSI also ignored contrary facts and their own evaluation. Dr. Ebrahimi was rightfully concerned about the process since no single person in the entire process explained to her the nature of the referral and evaluation.

55.     Upon report of Sanford's staff misconduct, Dr. Griffin forced Dr. Ebrahimi into the evaluation to be screened for Schizophrenia – which Dr. Ebrahimi does not have. Despite finding no signs of alleged Schizophrenia, now PSI tries to base the entirety of their conclusion on alleged "disruptive behavior," asserting Dr. Ebrahimi perceived the complaint about her to be unjustified. This is because the complaint about her was unjustified. None of the incidents in Dr. Griffin's Timeline, by themselves, indicate a "mental health problem" or "schizophrenia" or "disruptive behavior".

56.     PSI knew that the "schizophrenia" allegation by Sanford was false and erroneous. PSI knew that Dr. Griffin's timeline does not demonstrate "disruptive behavior". PSI was informed that this referral by Sanford and Dr. Griffin happened immediately following a report of a misconduct by Sanford's employees to Dr. Griffin on October 10th. And even with that knowledge, PSI made a discriminatory conclusion and

14

published a defamatory report and sent to both NDPHP and to Sanford, injuring Plaintiff through their defamatory and discriminatory statements and conclusion.

57.    PSI refused to provide Dr. Ebrahimi's entire file including NDPHP's referral note to Dr. Ebrahimi despite repeated requests made by her and through her counsel. They never addressed Dr. Ebrahimi's concerns and questions.

58.    On December 2, 2022, Darla Dobberstein, Sanford Executive Director, emailed Dr. Ebrahimi, advising her Sanford was ending her paid administrative leave and suggesting Dr. Ebrahimi apply for short term disability pay. Sanford stopped paying Dr. Ebrahimi and effectively terminated her employment, even though she was ready and able to return to work, forcing her to accept "disability" in order to be paid. Dr. Ebrahimi was never permitted to return to work by Sanford.

59.    On December 7, 2022, Dr. Ebrahimi received an email from NDPHP with a monitoring agreement. The email from Dr. Henke, medical director of NDPHP, threatened Dr. Ebrahimi with being reported to the North Dakota medical board if she did not sign the agreement. The monitoring program was compiled of embarrassing, humiliating, degrading and intrusive requirements with no obvious basis. The monitoring agreement was drafted in a way that stated Dr. Ebrahimi herself was seeking assistance.

60.    No medical professional has diagnosed Dr. Ebrahimi with any mental health disorders at any point in her life.

61.    The proposed monitoring agreement sent by Dr. Henke, treatment provider assigned by NDPHP, is biased, flawed and inappropriate without any rational basis. Dr. Ebrahimi did not seek to enroll with NDPHP. However, they sought to pressure her into

signing up for an intrusive and humiliating monitoring based on Sanford's demonstrably discriminatory and retaliatory actions and PSI's and NDPHP's inappropriate and discriminatory conclusions.

### VI. An Independent Second Evaluation Concluded that Dr. Ebrahimi is Clear of any Psychiatric or Neurocognitive Disorders

62. Dr. Ebrahimi subsequently underwent an independent evaluation of fitness to practice medicine by Dr. Hon Ho, a Board-Certified Adult & Child Psychiatrist with a Specialty in Addiction Medicine. Dr. Ebrahimi was examined at length by Dr. Ho on both December 16, 2022, and January 26, 2023. Dr. Ho also reviewed PSI's report on Dr. Ebrahimi, Timeline notes, laboratory reports, and her past medical history. Dr. Ho concluded that Dr. Ebrahimi was found to have no neurocognitive deficits and no psychiatric disorders that would prevent her from performing her duties as a physician in a safe, effective, and competent manner.

63. Dr. Ho pointed out the inconsistencies in PSI report. He noted that "The MCAP report seems to conclude that Dr. Ebrahimi was 'not fit to practice medicine with reasonable skill and safety." However, the same MCAP report also listed multiple evidence that suggest otherwise. He noted that PSI had already ruled out Schizophrenia or other psychosis. Dr. Ho referenced the normal screening and Mental Status Examination portion of the PSI. He also noted that under Summary, the PSI report admits that PSI clinicians could not ascertain [a psychiatric diagnosis]in this evaluation regarding her alleged behavior.

16

64.     Dr. Ho specifically disagreed with PSI's report on Dr. Ebrahimi's insight stating that disagreement does not necessarily mean limited insight but can rise from different perspectives.  Dr. Ho made another remark: "Report from Dr. Griffin has shown evidence that Dr. Ebrahimi was receptive to feedback and took appropriate actions to resolve issues. Hence, I do not necessarily agree that Dr. Ebrahimi was 'being unresponsive.' The MCAP report did not seem to explicitly consider or discuss the above factors before claiming disruptive physician behavior." Dr. Ho reasoned that PSI failed to consider the contradictory evidence submitted by Sanford, which undercut its claim that Dr. Ebrahimi exhibited "disruptive physician behavior."

65.     The Companies, Sanford, NDPHP and PSI had no objective evidence to support subjecting Dr. Ebrahimi to an incredibly intrusive and humiliating and impermissible medical evaluation and monitoring plan. Instead, Dr. Griffin based their decision on retaliatory and discriminatory bias against Dr. Ebrahimi, concocting a false and misleading narrative about her behavior over the prior months to manufacture a "concern" about her mental health.

66.     The Companies subjected a highly successful, professional, and competent physician like Dr. Ebrahimi to this degrading and disturbing process based on nothing more than rumors stirred up against a foreign-national who stood up for patient safety at Sanford.

67.     Upon information and belief, NDPHP, Sanford and PSI, individually and in concert with each other, communicated statements that they knew were false and

17

defamatory to push the investigation and PSI's biased report and NDPHP biased monitoring plan to be written for Dr. Ebrahimi.

68.     The Companies (Sanford, NDPHP and PSI) unlawfully restricted Dr. Ebrahimi's freedoms and ability to practice medicine.

69.     Because the evaluation done at PSI was not job related or consistent with business necessity, NDPHP, PSI, and Sanford required Dr. Ebrahimi to undergo an impermissible medical examination under the law.

70.     Refusal to provide records and referral notes, refusal to address questions and concerns, coercion to medical evaluation or treatment are against the law and HIPAA regulations.

### VII: Sanford Continued to Retaliate and Discriminate Against Dr. Ebrahimi and Ultimately Unlawfully Terminated her Employment

71.     Sanford continued to retaliate against Dr. Ebrahimi. At the time of referral to NDPHP, Dr. Griffin emailed and told Dr. Ebrahimi that she will remain on leave until she gets a clearance from an appropriate clinician to return. However, after forwarding Dr. Ho's report to NDPHP on February 21, 2023, Dr. Ebrahimi received an email notice from Sanford dated February 23, 2023, telling her that her employment with Sanford had been terminated effective February 3, 2023.

72.     Dr. Ebrahimi's employment Agreement with Sanford Health specifically also provides in section 12 (a) that ". . . either party may terminate the agreement by giving 90 days written notice to the other party." Dr. Ebrahimi never received any written notice of termination. Sanford's failure to provide 90 days written notice to Dr. Ebrahimi

18

of termination of the agreement constitutes a material breach of the Staff Physician Agreement for which Dr. Ebrahimi is entitled to compensation.

73. Dr. Ebrahimi did not resign or terminate her employment with Sanford, nor did she receive proper notice of termination from Sanford as required and in breach of her employment agreement with Sanford. Dr. Ebrahimi's employment Agreement with Sanford Health specifically provides in section 11 that "This agreement may not be orally canceled,… and no cancellation shall be effective or binding, unless in writing and signed by both parties to this agreement." Sanford's failure to provide any written and signed agreement constitutes a material breach of the Staff Physician Agreement.

74. NDPHP also failed to perform its role in Dr. Ebrahimi's return to work, and resulted in further retaliation against Dr. Ebrahimi.

75. The actions taken by Sanford in referring Dr. Ebrahimi to NDPHP and to institute an investigation into her and subjecting her to an impermissible medical exam and eventually unlawful termination of her employment were taken because Sanford discriminated and retaliated against Dr. Ebrahimi following her report of unlawful conduct. Making employment decisions and actions based on discrimination and retaliation for report of unlawful conduct is illegal.

76. The adverse employment actions are pretextual and manufacture in retaliation because they were only raised following her engaging in protected activity. Dr. Ebrahimi had never once heard any concern about her mental health or ability to effectively practice medicine prior to her report of patient safety concerns. Suddenly, however, when she engaged in this protected activity, the Companies became so

19

incredibly concerned with her mental health as to accuse her of having schizophrenia requiring immediate suspension of her duties. This sequence of events clearly demonstrates the Companies' motivation in concocting mental health concerns are pretext for retaliation against Dr. Ebrahimi.

77.     Alternatively, Sanford discriminated against Dr. Ebrahimi based on a claim of perceived mental health disorder, and this discrimination and decision making based on a perceived mental health disorder is illegal.

78.     NDPHP, PSI, and Sanford conspired to deprive Dr. Ebrahimi equal protection of the laws or equal privileges under the laws and as a result Dr. Ebrahimi was injured and deprived of certain rights or privileges.

79.     The above acts, omissions, and recommendations taken by NDPHP were not made in good faith.

80.     As a result of the above described retaliatory and discriminatory conduct of Sanford, PSI, and NDPHP, each of them, and together have prevented Dr. Ebrahimi from returning to work as a physician, either at Sanford and, most likely, anywhere in the United States. This interfered with and prevented Dr. Ebrahimi from fulfilling the terms of her board exam and state board licenses. As a result, she has sustained significant lost earnings and potential future earnings and benefits.

81.     As a result of the above described retaliatory and discriminatory conduct of Sanford, PSI, and NDPHP, each of them, and together have derailed not only Dr. Ebrahimi's professional career that she tirelessly built over decades, but her personal and emotional foundation and inflicted intentional defamation and emotional distress.

20

82.     Dr. Ebrahimi has complied with all administrative requirements in advance of bringing this matter to court.

## COUNT I
## FEDERAL CLAIM OF RETALIATION UNDER TITLE VII
## AS TO DEFENDANT SANFORD

83.     Plaintiff reincorporates by reference paragraphs 1 through 82 and incorporates them herein by reference.

84.     Defendant Sanford's actions as set forth above constitute discrimination and retaliation against plaintiff in violation of Title VII, 42 U.S.C. §2000e-3(a).

## COUNT II
## STATE CLAIM OF RETALIATION FOR REPORT OF UNLAWFUL CONDUCT
## AS TO DEFENDANT SANFORD

85.     Plaintiff reincorporates by reference paragraphs 1 through 82 and incorporates them by reference.

86.     Sanford's actions as set forth above constitute retaliation against Plaintiff in violation of NDCC §34-01-20.

## COUNT III
## FEDERAL CLAIM OF NATIONAL ORIGIN DISCRIMINATION
## AS TO DEFENDANT SANFORD

87.     Plaintiff reincorporates by reference paragraphs 1 through 82 and incorporates them herein by reference.

88.     Sanford's actions as set forth above constitute discrimination against Plaintiff based on her national origin in violation of 42 U.S.C. §2000e-2(a).

## COUNT IV
## STATE CLAIM OF NATIONAL ORIGIN DISCRIMINATION
## AS TO DEFENDANT SANFORD

21

89.     Plaintiff reincorporates by reference paragraphs 1 through 82 and incorporates them herein by reference.

90.     Sanford's actions as set forth above constitute discrimination against Plaintiff based on her national origin in violation of the NDHRA, NDCC §14-02.4-01 and §14-02.4-03.

## COUNT V
## FEDERAL CLAIM OF DISABILITY DISCRIMINATION
## AS TO DEFENDANT SANFORD

91.     Plaintiff reincorporates by reference paragraphs 1 through 82 and incorporates them herein by reference.

92.     Sanford's actions as set forth above constitute discrimination for a claim of perceived disability against Plaintiff in violation of the ADA, 42 U.S.C. §12112.

## COUNT VI
## STATE CLAIM OF DISABILITY DISCRIMINATION
## AS TO DEFENDANT SANFORD

93.     Plaintiff reincorporates by reference paragraphs 1 through 82 and incorporates them herein by reference.

94.     Sanford's actions as set forth above constitute discrimination for a claim of perceived disability against Plaintiff in violation of the NDHRA, NDCC §14-02.4-01 and §14-02.4-03.

## COUNT VII
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
## AS TO ALL DEFENDANTS

95.     Plaintiff reincorporates by reference paragraphs 1 through 82 and incorporates them by reference.

22

96.     The actions of defendants Sanford, NDPHP, and PSI, and each of them, as described above constitute the intentional infliction of emotional distress in violation of state law.

## COUNT VIII
## BREACH OF CONTRACT
## AS TO DEFENDANT SANFORD

97.     Plaintiff reincorporates by reference paragraphs 1 through 82 and incorporates them by reference.

98.     Sanford's actions as described above constitute a breach of its Staff Physician Agreement entered into by the parties and signed by Plaintiff on October 10, 2021, in violation of state law.

## COUNT IX
## CLAIM OF CONSPIRACY
## AS TO NDPHP

99.     Plaintiff reincorporates by reference paragraphs 1 through 82 and incorporates them herein.

100.    Defendant NDPHP's actions as set forth above constitute a conspiracy to deprive Plaintiff of her civil rights in violation of 42 U.S.C. §1985(3).

## COUNT X
## CLAIM OF CONSPIRACY
## AS TO SANFORD

101.    Plaintiff reincorporates by reference paragraphs 1 through 82 and incorporates them herein.

102.    Defendant Sanford's actions as set forth above constitute a conspiracy to deprive Plaintiff of her civil rights in violation of 42 U.S.C. §1985(3).

23

**COUNT XI**
**CLAIM OF CONSPIRACY**
**AS TO PSI**

103.   Plaintiff reincorporates by reference paragraphs 1 through 82 and incorporates them herein.

104.   Defendant PSI's actions as set forth above constitute a conspiracy to deprive Plaintiff of her civil rights in violation of 42 U.S.C. §1985(3).

**COUNT XII**
**TORTIOUS INTERFERENCE WITH CONTRACT**
**AS TO NDPHP**

105.   Plaintiff reincorporates by reference paragraphs 1 through 82 and incorporates them herein.

106.   Defendant NDPHP, by its actions as set forth above, interfered with Plaintiff's contract of employment with Sanford.

**COUNT XIII**
**TORTIOUS INTERFERENCE WITH CONTRACT**
**AS TO PSI**

107.   Plaintiff reincorporates by reference paragraphs 1 through 82 and incorporates by reference.

108.   Defendant PSI, by its actions as set forth above, interfered with Plaintiff's contract of employment with Sanford.

**COUNT XIV**
**DEFAMATION**
**AS TO NDPHP**

109.   Plaintiff reincorporates by reference paragraphs 1 through 82 and incorporates by reference.

24

110.    Defendant NDPHP, by its actions as set forth above, has defamed Plaintiff, both verbally and in writing, and these communications have injured or have a tendency to injure Plaintiff in her occupation in violation of ND Cent. Code § 14-02, *et seq*.

## COUNT XV
## DEFAMATION CLAIM
## AS TO SANFORD

111.    Plaintiff reincorporates by reference paragraphs 1 through 82 and incorporates by reference.

112.    Defendant Sanford, by its actions as set forth above, has defamed Plaintiff, both verbally and in writing, and these communications have injured or have a tendency to injure Plaintiff in her occupation in violation of ND Cent. Code § 14-02, *et seq*.

## COUNT XVI
## DEFAMATION CLAIM
## AS TO PSI

113.    Plaintiff reincorporates by reference paragraphs 1 through 82 and incorporates by reference.

114.    Defendant PSI, by its actions as set forth above, has defamed Plaintiff, both verbally and in writing, and these communications have injured or have a tendency to injure Plaintiff in her occupation in violation of ND Cent. Code § 14-02, *et seq*.

## COUNT XVII
## NEGLIGENCE
## AS TO SANFORD

115.    Plaintiff reincorporates by reference paragraphs 1 through 82 and incorporates herein.

25

116.   Defendant Sanford, by its actions as set forth above, negligently caused Plaintiff to be subjected to embarrassing, humiliating, degrading, and traumatizing experiences and testing and these injuries are the result of Sanford's failure to provide ordinary care in violation of ND Cent. Code § 9-10-06.

**COUNT XVIII**
**NEGLIGENCE**
**AS TO NDPHP**

117.   Plaintiff reincorporates by reference paragraphs 1 through 82 and incorporates herein.

118.   Defendant NDPHP, by its actions as set forth above, negligently caused Plaintiff to be subjected to embarrassing, humiliating, degrading, and traumatizing experiences and testing and these injuries are the result of NDPHP's failure to provide ordinary care in violation of ND Cent. Code § 9-10-06.

**COUNT XIX**
**NEGLIGENCE**
**AS TO PSI**

119.   Plaintiff reincorporates by reference paragraphs 1 through 82 and incorporates herein.

120.   Defendant PSI, by its actions as set forth above, subjected Plaintiff to embarrassing, humiliating, degrading, and traumatizing experiences and testing, and these injuries are the result of PSI's failure to provide ordinary care in violation of ND Cent. Code § 9-10-06.

**COUNT XX**
**CIVIL ASSAULT**
**AS TO PSI**

26

121.    Plaintiff reincorporates by reference paragraphs 1 through 82 and incorporates them herein.

122.    Defendant PSI, by its actions as set forth above, willfully caused bodily harm to Dr. Ebrahimi in violation of ND Cent. Code § 9-10, *et seq.*

## PRAYER FOR RELIEF

Wherefore, Plaintiff respectfully requests that this Court:

A. Order Defendants to make Plaintiff whole by providing appropriate backpay with prejudgment interest, in amounts to be determined at trial, and other affirmative relief, including front pay, necessary to eradicate the effects of its unlawful employment practices;

B. Order Defendants to make Plaintiff whole by providing compensation for past and future nonpecuniary losses resulting from the unlawful practices described herein, including but not limited to emotional pain and suffering, loss of enjoyment of life and humiliation in amounts to be determined at trial;

C. Order Defendants to pay Plaintiff for her personal injury damages sustained as a result of their negligent and tortious conduct;

D. Order Defendant Sanford to pay Plaintiff for the damages she has sustained as a result of its breach of contract with Plaintiff in amounts to be determined at trial;

E. Award Plaintiff her costs, disbursements and attorney's fees as permitted by law; and,

F. Grant such other relief as the court deems just and equitable.

## JURY TRIAL DEMAND

Plaintiff requests a jury trial on all questions of fact raised by her complaint.

Dated this 3rd day of April, 2024.

**FIEBIGER LAW, LLC**

by: s/Thomas D. Fiebiger
Thomas D. Fiebiger, ND ID #04190
Rolf T. Fiebiger, MN ID #391138
6800 France Ave. S.
Suite 190
Edina, MN 55435
612.399.6474
612.888.6084
tom@fiebigerlaw.com
rolf@fiebigerlaw.com

Attorneys for Plaintiff

## VERIFICATION

The undersigned Plaintiff has reviewed the complaint and knows or believes that all allegations that the Plaintiff has personal knowledge of to be true. The Plaintiff believes the allegations that the Plaintiff does not have personal knowledge to be true based on specified information, documents, or both. I declare under penalty of perjury that the foregoing is true and correct.

Dated: 04/03/2024     _____

Katayoon Baradaran Ebrahimi